Filed 3/17/23 In re I.R. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re I.R., a Person Coming Under the Juvenile Court Law. | B321398 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.M., Defendant and Appellant. | (Los Angeles County Super. Ct. No. 18CCJP00937C) |

APPEAL from an order of the Superior Court of Los Angeles County, Gabriela H. Shapiro, Judge Pro Tempore. Affirmed.

Pamela Deavours, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Interim County Counsel, and Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

————————————

Father appeals from the order terminating his parental rights under Welfare and Institutions Code section 366.26[1] as to I.R. (minor). Father contends the court erred when it denied application of the parental relationship exception to termination of parental rights under section 366.26, subdivision (c)(1)(B)(i). He further contends the court erroneously failed to ensure compliance with the inquiry and notice requirements of the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California statutes (Welf. & Inst. Code, § 224 et seq.).

We find no abuse of discretion in the court's decision to find inapplicable the parental relationship exception to termination of parental rights. Because we affirm the termination of parental rights and father only seeks relief for ICWA noncompliance if we agree with his argument about application of the parental relationship exception, we do not reach father's argument concerning compliance with ICWA and related California law.

## FACTUAL AND PROCEDURAL BACKGROUND

### Background Preceding Father's Prior Appeal

We set forth in full the factual and procedural history from our prior opinion, in which we resolved father's earlier appeal,

———————————

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

filed in December 2021, to challenge an order denying his section 388 petition. (*In re I.R.* (Dec. 29, 2022, B317369) [nonpub. opn.].)

*Family background and history*

Mother met father when she was 14 years old, and he was in his 20's.[2] Mother has been addicted to drugs since the age of 16. Mother and father had a lengthy history of domestic violence. Both parents have multiple other children, but we only review the child welfare history of three children relevant to the current case: minor (born March 2019); brother (born July 2005); sister (born September 2009); and half-brother on father's side. In 2008, half-brother was declared a dependent based on his mother's drug use. The juvenile court granted father sole custody of half-brother and terminated jurisdiction in October 2008. A separate case involving brother and sister began in 2010, based on sustained allegations of domestic violence and physical abuse of brother. The case ultimately ended in 2015, with the court granting maternal grandparents legal guardianship of the two children.

During most of her pregnancy with minor, mother was living in motels to avoid coming into contact with father, who had constantly threatened to kill her family in the past. Mother believed that father had vandalized maternal grandparents' property, including slashing the tires of maternal grandfather's truck and throwing paint on it. Mother tested positive for

_____

[2] Mother is not a party to this appeal. Her involvement in the dependency case was minimal, and we discuss her role only as relevant to father's appeal.

methamphetamine after giving birth to minor at a gestational age of 32 weeks in March 2019. At the hospital, mother acknowledged her drug use and understood why the Los Angeles County Department of Children and Family Services (Department) was involved.

Father had been visiting minor at the hospital, but nevertheless wanted to confirm paternity. He acknowledged using methamphetamine in the past, but claimed he stopped using drugs in early 2000. Father's lengthy criminal history included a 2007 conviction for threatening a crime with intent to terrorize and a 2010 conviction for child cruelty with a two-year prison sentence. More recently, father entered a guilty plea for possession of brass knuckles and was anticipating turning himself in to serve an eight-month jail sentence on April 12, 2019. Minor's maternal aunt and uncle (caregivers) reported that mother wanted them to care for minor.

*Father's mixed participation in reunification services in current case*

Once minor was discharged from the hospital in April 2019, she was detained from parental custody and placed with caregivers. In June 2019, the court sustained jurisdictional allegations under section 300, subdivisions (b) and (j), based on the parents' history of domestic violence and the prior dependency case involving sister and brother. Father was permitted monitored visits three times per week, and the court ordered him to complete a 52-week domestic violence program and parenting education program, and to participate in individual counseling. Minor remained placed with caregivers.

4

The Department's six-month review report noted several concerning details about father's visits with minor. The caregivers were initially monitoring father's visits with minor, but they reported that very little engagement and bonding took place, and father would curse and say bad things about mother and maternal family members while holding minor. The caregivers stopped monitoring father's visits in May 2019, because they no longer felt comfortable or safe doing so. Paternal grandmother monitored father's visits starting in late May 2019, and she reported no concerns.

In July 2019, father enrolled in a domestic violence program with Acacia Counseling, but his participation was terminated in October 2019 due to poor attendance (father had missed five of 13 sessions). He enrolled in a parenting program on August 23, 2019, and had attended five weekly sessions as of October 24, 2019. He was participating in weekly individual counseling sessions, making progress on his therapy goals, focused on addressing domestic violence, anger management, and coping skills.

In September 2019, the Department substantiated a report that father had physically abused half-brother. Father, who was previously living with paternal grandmother and half-brother, moved out of paternal grandmother's home and was living with an acquaintance. Because paternal grandmother had been present when father abused half-brother, she was no longer an appropriate monitor for father's visits with minor. By late November 2019, the social worker and father identified a new monitor and a location for future visits.

At the December 2019 six-month review hearing, the court ordered the Department to continue providing reunification

services and to set up a visitation schedule for father. The 12-month review hearing, originally scheduled for June 2020, was continued to September 18, 2020 due to the COVID-19 pandemic.

*Twelve-month review report and hearing—court grants father an additional six months of reunification services*

The Department's 12-month review report described minor as a joyful child who was well bonded to the caregivers. Due to COVID-19, father's monitored visits switched over to remote visits using a phone application. The monitor reported there was tension between the caregivers and father, but the monitor reported no concerns about the visits. While it is not clear from the record when father resumed in-person visits, the Department liberalized his visits to permit unmonitored visits in person beginning July 21, 2020, three times a week for three hours per visit, with the exchange taking place at a police station. No issues were reported regarding the exchanges, and father reported he and minor were bonding more and minor was comfortable with him. Caregivers reported minor often returned fussy and in a bad mood.

Father had strong participation in his domestic violence and parenting classes in the first half of 2020, but began to falter in July and August of the same year. Acacia Counseling, the same domestic violence program that had previously terminated father's participation in October 2019, permitted father to return and reported he was doing well as of June 2020. However, even after the program director spoke to father about the importance of consistent attendance, and changed class dates to accommodate father's work schedule, father had five absences,

resulting in another termination from the program in August 2020. According to the program director, father verbally abused female staff members when the female facilitator brought father's lack of attendance to his attention. Father accused the program director of making false claims about his behavior; father also claimed that the program director refused to give father his transcripts so he could enroll at another program. The program director responded that father's termination letter had the necessary transcript information. Father was able to enroll in a different domestic violence program through Baldwin Park Counseling on August 27, 2020.

Father had attended 15 sessions of parenting classes through Spiritt Family Centers before the program stopped in-person sessions in March 2020 due to COVID-19. Thereafter, father's participation in video sessions was consistent and he was an active participant. However, on July 17, 2020, father was reportedly "concerned about going back to jail for something that took place in the past and had a nervous breakdown," becoming very angry, yelling and swearing. By August 25, 2020, father had missed approximately four to five weeks of sessions, although he attended a session on August 21, 2020. The program facilitator felt that father needed to attend an anger management program, and did not believe father was ready to have children returned to his care.

By August 19, 2020, father had completed 56 individual counseling sessions. A letter describing father's progress stated that the therapist was "addressing case-related issues surrounding anxiety, emotional regulation[,] and anger management." Father's treatment included "identification of triggers related to anger, best practices for emotional regulation,

7

understanding parental responsibilities related to child safety, fostering personal insight, developing and maintaining healthy coping skills, and challenging historic narratives that are incompatible with [father's] treatment goals." The therapist noted that while father had "demonstrated growth," his treatment was "not yet in the end-phase." Father maintained his participation in individual counseling, and continued to make progress in dealing with anxiety, emotional regulation, anger management, and identifying triggers related to his anger.

The Department's review report made no mention of a pending criminal case against father. The Department recommended continuing reunification services for father, and setting a date for an 18-month review hearing.

At the 12-month review hearing on September 18, 2020, the court considered the Department's reports and arguments from counsel. After father acknowledged to the court that he understood he needed to secure housing, and stated he had been reinstated and had completed 30 weeks of a 52-week domestic violence program, the court found that father was likely to reunify within the next six months, and ordered the Department to continue providing reunification services.

*Eighteen-month review report and hearing—reunification services are terminated after father is incarcerated.*

The Department's 18-month review report included information that was known, at least to father, at the time of the 12-month review hearing, but that was not included in the Department's 12-month review report. Neither father nor the Department communicated the following information to the court

8

at the 12-month review hearing, which took place on September 18, 2020. On September 17, 2020, father informed the social worker he would be turning himself in on September 21, 2020, to serve 220 days in county jail, with a hope that he would be released early. The jail term stemmed from father violating a restraining order restricting father from having physical contact with half-brother. Father had received notice in April 2020 of the criminal hearing scheduled for July 13, 2020. Father reportedly went to court with an intent to "fight the case," but after consulting with his public defender, he decided to turn himself in for jail time. Father also reported he had informed the caregivers that he would not be able to have visits with minor. The social worker confirmed with the jail that father's projected release date was in February 2021. It is unclear whether the Department was aware of pending criminal charges against father or the details of an open dependency case involving half-brother at the time the 12-month review report was prepared in September 2020.

Most of the remaining information in the Department's 18-month status review report simply repeated the information given in the Department's 12-month status review report. The caregivers expressed interest in providing permanency. Considering father's prior problems completing reunification services, as well as the fact that "he was incarcerated as a result of violating a restraining order protecting [half-brother], who has a Dependency case open in part due to father's physical abuse," and father's anticipated release date of February 2021, the Department recommended terminating reunification services for father and setting a hearing under section 366.26.

The court terminated father's reunification services on December 15, 2020. There is no indication in the record that

father requested or had any visits with minor while he was incarcerated from September 2020 through February 2021. After he was released from jail in late February 2021, father had monitored visits with minor three times per week for three hours per visit. Although the Department had previously determined paternal grandmother was no longer an appropriate monitor in 2019, the record does not explain why she resumed monitoring father's visits after his release from incarceration.

*Father's section 388 petition*

On June 16, 2021, father filed a petition under section 388, asking the court to vacate its December 2020 order, reinstate reunification services, and order unmonitored and weekend overnight visits with minor, along with services such as conjoint counseling to address any barriers to reunification. Attached to father's section 388 petition were letters demonstrating that father had completed 52 sessions of a domestic violence program (including 28 sessions credited from his sessions with Acacia Counseling), 27 sessions of parenting classes, including 19 sessions since January 2021, and 73 sessions of individual counseling since March 2019. The court scheduled an evidentiary hearing, and directed the Department to file a response to the petition.

*Subsequent reports and evidentiary hearing*

In July 2021, father requested a nine-hour monitored visit to take place on July 31, 2021, so he could take minor to Knott's Berry Farm to celebrate brother's birthday, together with sister

and half-brother. The caregivers agreed to a six-hour visit, but during the visit, father had difficulty managing his time with minor and the siblings simultaneously. He called the caregivers and asked them to pick minor up from Knott's Berry Farm, and they did so at 2:15 p.m. On August 6, 2021, the caregivers reported they had received a phone call from sister, who was present during the Knott's Berry Farm trip. Sister informed the caregivers that after the caregivers had picked minor up at Knott's Berry Farm, father started making claims that he was going to kill the caregivers, and that while father was making the threats, paternal grandmother was telling him to "be quiet."

Father had monitored visits with minor three times a week, monitored by paternal grandmother. Father's communications with the social worker in August 2021 evidenced continuing tensions and distrust between father and maternal family members. The caregivers reported minor would return after visits in a fussy or agitated mood, often hitting herself on the head in anger. Father reported that during visits, he would feed minor and take her to the park to play. He felt well-bonded to minor. Paternal grandmother expressed to the social worker that she had no concerns regarding father's behavior, and that father deserved unmonitored visits.

At the evidentiary hearing on father's section 388 petition, the court heard testimony from father's therapist. The therapist described the work father had done to identify his triggers and learn coping mechanisms. The therapist acknowledged father continued to struggle with triggers and anger issues, and described father's feelings relating to the caregivers as "frustration, not being properly understood, being misrepresented." Paternal grandmother testified about father's

11

visits with minor, and about the family visit to Knott's Berry Farm, denying that father threatened to kill the caregivers. She never had any concerns about father's behavior towards any of his children, had never seen him get angry and never heard other family members describe him as getting angry. She was aware that a restraining order protected half-brother from father, but was not sure if father had violated the restraining order. She believed father had a positive relationship with minor, and he should have unmonitored visits. Father testified about his relationship with mother and her family, describing both relationships as "toxic." He described his request for a nine-hour visit with minor, stating the caregivers would only agree to three or four hours. He denied being upset, saying instead he was "disappointed." Responding to the court's questions, father described his relationship with caregivers starting out okay, but deteriorating over time, and that it was currently "real shaky." Father did not know why the relationship had deteriorated.

After hearing oral argument from all parties, the court denied father's section 388 petition. The court explained that while father's testimony was compelling, the court credited the report that father had threatened the caregivers and found paternal grandmother was not credible. Father had not shown a sufficient change in circumstances, based on his lengthy history of domestic violence, having recently harassed female staff, and having been arrested for abusing his son.

**Current relevant facts**

After his section 388 petition was denied by the juvenile court on December 13, 2021, and while his appeal of that ruling

12

was pending before his court, father continued monitored visits with minor.

Dr. Inez Gonzalez, a clinical and forensic psychologist, was appointed by the court to perform a mental health evaluation to assess the relationship between father and minor concerning the parent-child bond. In February 2022, Dr. Gonzalez, observed one of father's three-to-four hour monitored visits with minor, which took place at a public park. Dr. Gonzalez also reviewed the case file, including the Department's reports. Dr. Gonzalez prepared a bonding study report, dated March 27, 2022, that summarized the case history based on the Department's reports, Dr. Gonzalez's interview of the monitor, and Dr. Gonzalez's observations of father, minor, and their interactions during the monitored visit at the public park. The report notes that its recommendations were based on this "single assessment." Dr. Gonzalez concluded that minor had a secure attachment with father, and research indicated severing that bond at minor's stage of development "will likely lead to an increase in aggression, defiance, distress, anxiety, and/or depressive symptoms in the future." Based on her evaluation, Dr. Gonzalez recommended that father should resume unmonitored visits with minor, as more quality time appeared to be needed between them and the likelihood of harm to minor was currently low as father was making efforts to comply with court ordered programs, including his individual therapy.

Once the bonding study was filed with the court, the court continued the permanency planning hearing under section 366.26 and ordered the Department to file a last minute information report addressing the Department's position on the bonding study and minor's perspective regarding her relationship with

13

her father.  In addition to ordering the parties to file exhibit and witness lists for the section 366.26 hearing, the court's order stated, "Father is to have monitored visits 3 times per week, if possible.  [The Department] is to ensure father gets his visitation."  The court's subsequent order, entered about a month later, ordered the Department to "ensure father receives his minimum visit" in a Department office, "to re-assess the paternal grandmother as monitor for father's visit," and if paternal grandmother was not approved as a monitor, "to address why not in the next report."

According to the Department's June 9, 2022 status review report, the Department was only able to provide a monitor (an HSA or health services aide) for one three-hour visit per week. Father asserted that the Department was denying him additional hours of visitation and requested a second monitor to be assigned. The Department explained to father that its resources were limited, and there were other families on the waitlist for any monitor.  Father was encouraged to explore whether anyone in his circle of support was willing to be assessed as a monitor, including neighbors, friends extended family, colleagues, teachers, or members of his community or church.  A professional monitor was also an option, and the Department could provide him a list if he wanted to explore that option.  Father responded that because he had spent $5,000 on an attorney to sue the maternal side of the family for defamation, he lacked funding to pay a professional monitor.  The Department noted that father was primarily focused on his own wants, needs, and schedule, as he asked for the time of visits to be changed from morning to late afternoon/early evening so it would not impact his work schedule. He also asked for the visits to be moved closer to him, even

though the caregiver was traveling 100 miles round trip to bring minor to visits, while father lived only 31 to 35 miles away from the visit location. Father proposed having minor's half-sibling or paternal grandmother as monitors, but the Department was not willing to agree, given father's history with both relatives. Father did not provide any other potential monitors.

The Department's report provided a brief description of the logistics and nature of father's visits, which took place on Thursday mornings from 9:00 a.m. to noon. The caregivers transported minor to an address from which the monitor would take minor to a park a few blocks away for the visit with father. Father was always on time and arrived prepared with diapers, snacks, and toys. The monitor expressed no concerns regarding minor's visits with father. The report did not contain any details about minor's demeanor during or after visits, nor did it provide any information about the Department's position on the bonding study, or minor's perspective on her relationship with father.

Describing minor's bond with her caregivers, the report noted minor remains in the home of the same caregivers she has lived with since April 2019, and she is very joyful and well-bonded to her caregivers, as well as her siblings. Minor was assessed as "adoption ready," and the Department recommended proceeding with a permanent plan of adoption.

*Section 366.26 hearing*

At the June 9, 2022 permanency planning hearing under section 366.26, the court admitted into evidence the bonding study, the Department's review reports, and a June 6, 2022 letter from father's therapist. The therapist's letter confirmed that

15

father continued attending weekly therapy, and had completed 122 sessions.  The court declined to admit two exhibits offered by father, related to the dismissal of a petition for a civil harassment restraining order filed by maternal grandfather against father.

The court heard testimony from Dr. Gonzalez, who was questioned by counsel for the Department, minor's counsel, and father's counsel about the bonding study she had prepared. Dr. Gonzalez acknowledged she had not observed minor's interactions with other adults; she was also aware that minor had always lived with her current caregivers and never lived with father.  Dr. Gonzalez testified that such information would have no bearing on her assessment of the relationship between father and daughter.  Dr. Gonzalez testified minor had a secure bond with father, with each showing affection for the other. Minor noticed when father stepped away briefly, showed happiness when he returned, and showed him her pride in her accomplishments.  Dr. Gonzalez acknowledged she did not observe minor's demeanor when first seeing father at the beginning of the visit or her demeanor when leaving the visit. Dr. Gonzalez opined that if visits were to stop at that time, minor would have feelings of abandonment; this would cause current and future harm.  Dr. Gonzalez stated she did not ask about minor's feelings when her visits stopped while father had been incarcerated for five months beginning in September 2020. Dr. Gonzalez explained that, while it would be good to have that information, the effects of terminating a secure bond would not necessarily be immediately apparent, instead showing up over time and impacting how a person develops relationships in the future.  Dr. Gonzalez did not interview minor about how minor feels about her father, because minor did not feel comfortable

speaking with Dr. Gonzales.  To the extent minor had a secure relationship with caregivers, that was a good thing, but it did not diminish minor's secure attachment to father.  Dr. Gonzalez's recommendation for unmonitored visits was based on her review of the case history and her conversation with the monitor, who had only monitored five or six visits.  Dr. Gonzalez was unaware that minor's sibling had reported hearing father make threats towards maternal family members, and agreed that such statements would not be appropriate or healthy for a child.  Dr. Gonzalez further testified that she was aware that minor had been placed with her current caregivers for essentially her entire life.  However, Dr. Gonzalez did not evaluate minor's relationship with her current caregivers and had no opinion on whether minor would be affected by ending the relationship with those caregivers.

In closing argument, minor's counsel asked the court to terminate parental rights, arguing that minor's bond with father was distinguishable from the bond at issue in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), where the minor in question had lived with his mother for the first four years of his life and was interviewed about his relationship with his mother.  In the present case, minor had never lived with father.  Minor's counsel further argued that Dr. Gonzalez reached her opinion without talking with minor at all, without inquiring about minor's reaction to visits ceasing for five months during father's incarceration, and without considering the impact on minor of terminating the relationship with her consistent, long-term caregivers.  As such, father had not shown that the final factor in *Caden C.*—that the detriment caused by terminating the parental relationship outweighed the benefits of adoption—was

17

met.  Father asked the court to order a legal guardianship rather than terminate father's parental rights.  Relying principally on the bonding study, father argued he had met all the requirements of the parental relationship exception and *Caden C.*  Department's counsel joined in the arguments of minor's counsel.

The juvenile court noted that the order appointing an expert for the bonding study only asked for an assessment of the parental bond between father and minor.  The order did not seek an assessment of the bond between minor and her caregivers.  While it was understandable that Dr. Gonzalez did not address the bond minor had with her caregivers, the law required the court to engage in such a balancing.  The court credited the argument made by minor's counsel, and found the facts before it to be distinguishable from *Caden C.*  The evidence showed that even if father had positive visits with minor, father still had a contentious relationship with the caregivers, and had not made enough progress to take custody of minor, making father's proposed order of legal guardianship not viable.  The court did not foresee a possible outcome where father retained parental rights that would not negatively impact minor, instead concluding that minor's relationship with her current caregivers outweighed any bond or relationship she had with father.  It found the parental relationship exception inapplicable, and found minor to be adoptable.

# DISCUSSION

## *Parental relationship exception*

Father argues that in terminating parental rights and determining that the parental relationship exception did not apply, the trial court failed to account for the strength of his bond with minor and improperly considered his failure to address the factors that led to the dependency proceeding. We find no error in the court's decision to find the parental relationship exception inapplicable.

<u>Relevant law and standard of review</u>

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the juvenile court has decided to end reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1).) " 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) Guardianship is a less preferable option, because it " 'falls short of the secure and permanent future the Legislature had in mind for the dependent child.' " (*Ibid.*)

Once it has been determined that a minor is adoptable, "the court must order adoption and its necessary consequence, termination of parental rights," unless a parent can demonstrate one of the exceptions set forth in section 366.26 applies. (*In re Celine R., supra,* 31 Cal.4th at p. 53; see § 366.26, subd. (c)(1); *Caden C., supra,* 11 Cal.5th at p. 625.) The specified

circumstances in section 366.26, subdivision (c)(1)(B) are "actually, *exceptions* to the general rule that the court must choose adoption where possible." (*In re Celine R.*, at p. 53.) They " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.] At this stage of the dependency proceedings, 'it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home.' [Citation.] The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*Ibid*.; see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1150.)

The exception at issue here is the parental relationship exception, which permits the selection of another permanent plan if the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) The parent has the burden of establishing this exception. (*In re A.L.*, *supra,* 73 Cal.App.5th at p. 1153.) As the Supreme Court explained in *Caden C.*, *supra,* 11 Cal.5th at page 636, the exception requires the parent to establish, by a preponderance of the evidence: (1) the parent has maintained regular visitation and contact with the child, "taking into account the extent of visitation permitted"; (2) the child has a substantial, positive, emotional attachment to the parent such that the child would benefit from continuing the relationship; and (3) terminating the relationship "would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." The "language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations

20

where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Id.* at p. 630.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id.* at pp. 633–634.) However, if " 'severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Id.* at p. 633.) The California Supreme Court has instructed juvenile courts to "seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony." (*Ibid.*, fn. 4.) However, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child and the existence of a parental relationship for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) "There is, however, no single formulation of the substantial evidence test for all its applications." (*In re R.V.* (2015) 61 Cal.4th 181, 200.) Where a party fails to meet its burden on an issue in the juvenile court, "the inquiry on appeal is whether the weight and character of the evidence . . . was such that the juvenile court could not reasonably reject it." (*Id.* at p. 201.) We review the third step— whether termination of parental rights would be detrimental to

21

the child due to the child's relationship with his or her parent—
for abuse of discretion.  (*Caden C.*, at p. 640.)

Analysis

The parties do not dispute that father met the first
*Caden C.* factor by maintaining consistent visits with minor.
Solely for the purpose of our discussion here, we will also assume
that the record contains substantial evidence to support a finding
that father met the second *Caden C.* factor, that minor and father
shared a substantial positive emotional relationship.

The third *Caden C.* factor is a balancing test, and father
has not shown that the trial court abused its discretion when it
declined to find that "losing the relationship with the parent
would harm the child to an extent not outweighed, on balance, by
the security of a new, adoptive home." (*Caden C.*, *supra*,
11 Cal.5th at p. 634.)  In announcing its decision, the trial court
expressly noted that the bonding expert was not asked to
consider or balance the benefits of the permanency and stability
minor would receive if she were adopted by the caregivers with
whom she had lived her entire life, against the detriment of
terminating her bond with father.

Father argues that in applying the third *Caden C.* factor,
the court improperly considered information that was irrelevant
or remote in time, such as father's threats against the caregivers
and his verbal abuse of staff at the counseling center, or his
ability to fulfill a parental role.  In addition, pointing to the
decision to exclude his proffered evidence of maternal family's
unsuccessful attempt to obtain a restraining order against him,
father argues that the juvenile court erroneously discounted the
option of legal guardianship.  He also argues that there was no

evidence in the record to controvert the bonding expert's conclusion that minor would suffer detriment if father's parental rights were terminated.

We do not read the record here as suggesting the court's statements were "intended to be a comprehensive recitation of the grounds for its decision." (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1156.) Rather, the court's findings followed argument by all counsel, incorporating the arguments of minor's counsel, who asked the court to deny the parental relationship exception and terminate parental rights. Although father tries to present the court's statements as evidence that the judge was engaging in an unfair comparison between the caregivers and father, or blaming him for tense relations between father on the one hand, and caregivers and other maternal family members on the other, we disagree with father's interpretation. The court's comments reflect that the court was balancing the future likelihood of detriment caused by severing father's parental rights against the potential future benefits of the stability to be gained by adoption. This is an exercise that the Supreme Court has recognized requires courts to "engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain." (*Caden C.*, *supra*, 11 Cal.5th at p. 640.) To the extent father argues that the court's decision to sustain objections to two of his exhibits led the court to erroneously conclude that he was the only blameworthy party or the source of ongoing tension between him and the caregivers, we disagree. Rather, the court recognized that the relationship between father and the maternal family was a fraught one, regardless of blame. To the extent father purports to raise evidentiary error in the exclusion of his exhibits, in light of the

foregoing, any such error would be harmless. (See *In re N.V.* (2010) 189 Cal.App.4th 25, 31.) Even accepting that severing minor's relationship with father would cause detriment, as Dr. Gonzalez opined, father has not shown that the court abused its discretion in finding that detriment was outweighed by the benefits of adoption by minor's caregivers.

## ICWA

Father's opening brief states that he "is not asking for a limited reversal and remand to address the ICWA." Instead, if we agree with his argument that "the court erred when it found he had not proven the parental benefit exception," and we remand with instructions to conduct a new hearing under section 366.26, then he asks "for an order that the ICWA be properly addressed." The Department concedes that it did not fulfill its duty of initial inquiry, but argues that any error is harmless.

Having concluded that the juvenile court did not abuse its discretion when it found the parental relationship exception inapplicable, consistent with the limitations on the scope of father's appeal, we need not reach the ICWA contention.

24

# DISPOSITION

The juvenile court's June 9, 2022, order terminating parental rights under Welfare and Institutions Code section 366.26 is affirmed.

NOT TO BE PUBLISHED.


MOOR, J.


We concur:


RUBIN, P. J.


BAKER, J.